# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>DOUGLAS ELSWORTH WILSON, et al,<br><br>　　　　　　　　Defendant. | CASE NO. 11-cv-1651-GPC-BLM<br><br>**ORDER**<br><br>**(1) APPROVING PARTIAL RESTITUTION DISTRIBUTION PLAN**<br><br>**(2) DENYING EXPARTE MOTION FOR RECONSIDERATION**<br><br>[DKT. NOs. 39, 49, 71] |

For the reasons below, the Court hereby **APPROVES** the Partial Restitution Distribution Plan and all objections are overruled.

## I. BACKGROUND

On July 27, 2011, Plaintiff United States Commodity Futures Trading Commission ("Plaintiff" or "Commission") filed a complaint against Defendants Douglas Elsworth Wilson, Elsworth Berg Capital Management LLC, Elsworth Berg Inc., and Elsworth Berg FX LLC ("Defendants") seeking injunctive and other

equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act, as amended by the Food, Conservation and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Re-authorization Act of 2008), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008).(Dkt. No. 1.) On September 13, 2011, the Court filed a Consent Order of Preliminary Injunction and Other Ancillary Relief. (Dkt. No. 17, "Preliminary Injunction.") The Preliminary Injunction froze existing and after-acquired assets "within the custody, control, or actual constructive possession of any Defendant, whether held in the name of any Defendant or otherwise, and wherever held, including but not limited to all property held in safes or safe deposit boxes or on deposit with any financial institution, bank, savings and loan, brokerage firm, or futures commission merchant." (Id. at 6.) On February 9, 2012, the Court ordered the transfer of these frozen assets to the Court registry, requiring the transfer of funds held in 18 separate accounts held at seven different financial institutions. (Dkt. No. 33.)

On August 3, 2012, the parties reached agreement on a Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief against all Defendants. (Dkt. No. 43, "Permanent Injunction.") The Court entered the terms of the Permanent Injunction on August 9, 2012, thereby terminating the civil case. (Dkt. No. 44.) The Permanent Injunction provided the terms of settlement of all charges alleged in the complaint against Defendants without a trial on the merits. (Id.) In sum, the Court found that the Defendants defrauded investors by misrepresenting and/or failing to disclose to customers that their principal investments were secured or guaranteed in various ways by use of the Collateral Reserve, in violation of various provisions of the CFTC Re-authorization Act. (Id. at 15-16.)

In this case, the parties did not seek the appointment of a receiver. Rather, the Commission itself is serving the functions often performed by a receiver, including providing the court with a recommendation on how to distribute available

funds to Defendants' customers. (See Dkt. No. 64, "Commission Response.") In order to return available assets as partial restitution to parties who have invested in Defendants' fraudulent enterprise, the parties moved the Court to initiate a Partial Restitution Distribution Plan ("Distribution Plan") to distribute funds currently held in the Court registry. (Dkt. No. 39.) The proposed Distribution Plan covers all customers who contributed to any of Defendants' products that included a Collateral Reserve component. (Id.)

On July 10, 2012, the Court approved the initiation of the Distribution Plan to specific Customers of the Defendants. (Dkt. No. 40.) The Court ordered the Commission to distribute to Customers of Defendants the Distribution Plan, a copy of the Joint Motion for Entry of Consent Order Initiating a Partial Restitution Distribution Plan, and a copy of the Order. (Id.) Customers were permitted six weeks upon receipt of the Distribution Plan to file objections with the Court. (Id.) The Court permitted Plaintiff to file a response to any submitted Customer objections, and noted that, if necessary, the Court would set a hearing date to address Customers' objections. (Id.)

On September 12, 2012, the Court approved the distribution of the Revised Recommendation for Distribution of Partial Restitution ("Revised Recommendation"), which provided a slight modification to the Distribution Plan. (Dkt. No. 54.) The Court further ordered Customers to file objections to the Revised Recommendation within six weeks of receipt. (Id.)

During the objection period, several Customers filed objections. (See Dkt. Nos. 41, 42, 46, 48, 51, 57, 60, 63, 64, "Customers Objections.")

After the period for objections ended, the Commission filed a Response to Customers objections to the Partial Restitution Distribution Plan. (Dkt. No. 64, "Commission Response.")

On June 3, 2013, Customer Ron White filed an additional objection entitled "ExParte Motion for Reconsideration." (Dkt. No. 71.) On June 7, 2013, the

Commission filed a response. (Dkt. No. 72.)

**A. The Distribution Plan and Revised Recommendation**

Melissa Glasbrenner, a Futures Trading Investigator with the Division of Enforcement of the U.S. Commodity Futures Trading Commission, submitted a declaration reflecting the parties' proposed Distribution Plan which outlines the specific proposed method. (Dkt. No. 39-1, "Glasbrenner Declaration.") Over the course of the investigation into Defendants' fraudulent activities, Ms. Glasbrenner reviewed Defendants' business records, accounts, trading statements and related documents, and reviewed correspondence and transactions between Defendants and the customers. (Id. at 1-2.) As of July 12, 2012, the balance in the Court registry to distribute among Customers was $701,412.93, with interest accruing daily. (Id.) The amount available falls far short of roughly $4,000,000.00 that Ms. Glasbrenner estimates reflects the customers' total claim. (Id. at 5.)

The goal of the Distribution Plan is to "provide, as far as is possible given practical limitations, an equal return of the money customers initially invested in Defendants' investment vehicles." (Dkt. No. 39 at 3.) Under the Distribution Plan, seventy-two client accounts are "allowable claimants." (Glasbrenner Declaration at 5.) The Commission proposes utilizing the "Rising Tide" method to distribute available funds to allowable claimants. Under this method:

> Customers are allowed to keep distributions made to customers prior to the issuance of the PI Order, but these distributions are credited against their calculated pro rata share, dollar for dollar. As a result, customers who previously received distributions equal to or in excess of their gross investment would not receive any additional funds as part of the rising tide method of distribution. (Id.)

The basic rising tide formula is as follows: **((actual dollars invested) x (pro rata multiplier)) - withdrawals previously received.** (Dkt. No. 39 at 4.) Thus, distributions are made only to those who have previously received a return of funds in an amount less than their respective pro rata distribution amount. (Id.) Customers

who previously withdrew more than their pro rata distribution amount are not required to return a portion of previously withdrawn funds to the court registry. (Id.)

The parties propose utilizing the Rising Tide Method as it provides a more equitable distribution of funds than the Net Loss Method. Under the Net Loss Method, funds previously received by a customer are subtracted from the total amount invested prior to calculating the investor's pro rata share. (Dkt. No. 39 at 5.) The Rising Tide method prevents a customer who previously received funds as withdrawals from benefitting at the expense of other investors by retaining the benefit of the full amount of his withdrawal plus a distribution calculated on the basis of net funds invested. (Id.)

The parties initially determined twenty-seven customers had been "overpaid" or previously received distributions in excess of their calculated gross distribution. (Id. at 7.) Accordingly, the parties proposed 45 non-overpaid eligible claimants. (Id.; see also Dkt. No. 39-1, Exhibit 1.) Following the receipt of additional information, the parties proposed a Revised Recommendation, which accounted for seven additional eligible customers on the basis that their account contributions were collateralized by Defendants' "Collateral Reserve Trust." (Dkt. No. 49-1, "Glasbrenner Supplemental Declaration.") The Revised Recommendation further reduces Customers Cole, Lynn and Bosshart's net investment balance to account for withdrawals not previously reflected in the records. (Id. at 3-4.) The Revised Recommendation also concludes that fourteen additional "ineligible" customers were not collateralized and therefore are not entitled to receive a distribution of restitution.(Id. at 4-5.) Additional records retrieved regarding Customer Ron White's investment indicated a previously unaccounted $50,000 contribution, an amount reflected in the Revised Recommendation. (Id. at 5.) These changes are reflected in the Revised Recommendation for Distribution of Partial Restitution. (Id., Exhibit 1.)

**B. Customer Objections and Commission Responses**

The following Customers of the Defendants filed objections to the Distribution Plan and Revised Recommendations and the Commission provided a response following the end of the objection period.

### i. "General Objections" filed by Ken Charbauski, Kenneth Lee Saller; Augustine and Marva Powell (Dkt. Nos. 41, 46,57.)

Three customers make general objections to the Rising Tide Method. First, Mr. Ken Charbauski advocates for the "Net Loss" method as opposed to the Rising Tide method, asserting that investors such as himself had to meet a $50,000 minimum balance to open an account. As a customer who invested a greater amount of money, he asks that customers who had to meet the minimum balance in the original prospectus be entitled to a distribution. Second, Mr. Kenneth Lee Saller makes a general objection to the Distribution Plan, and contends that he should not be penalized for withdrawing funds prior to the initiation of this litigation. Third, Mr. Augustine and Ms. Marva Powell also make general objections, and request the Court restore their $49,000 investment.

The Commission responds by first recognizing that certain customers who previously withdrew large amounts from their Elsworth Berg accounts will not receive any further distribution. (Commission Response at 3.) Although this leads to dissatisfaction, the Commission asserts the Rising Tide Method produces the fairest result.(Id.) The Commission further notes that it does not seek a "clawback" of funds - customers who withdrew more than their pro rata share will not be required to return those funds. Mr. Saller is indeed one of those beneficiaries. (Id.)

### ii. Former Accountants - Scott W. Smith, CPA, Sandefer, Smith & Ass. (Dkt. No. 42.)

Mr. Scott Smith filed an objection on behalf of Sandefer, Smith & Associates ("SSA"), an accounting firm hired by the Defendants to perform services for the years 2006-2010. Based on certain alleged assurances from the Defendants and the Commission, SSA asserts that it is entitled to full payment for the services rendered,

and asks that the Court pay them the outstanding balance of $24,459.75 prior to the distribution of funds to the Customers.

The Commission makes several observations about SSA's objections. First, the Commission observes the funds in the court registry are directly traceable to the $1 million in life insurance policy proceeds that rightfully belong to Defendants' customers. (Commission response at 8.) The Court previously rejected an argument from two attorneys/creditors who sought to retain Collateral Reserve Trust funds because those funds were traceable to the funds exclusively set aside for the Defendants Customers and the assets available are already less than the amount owed to the alleged victims. (Id.; See also Dkt. No. 26.) The Commission points out SSA fails to mention that it has received $40,000 from the Defendants as payment for their work, and this payment represents a 62% recovery - far greater than the recovery of most of the customers. (Id. at 9.) Moreover, SSA should not receive priority over customer claims. Precedent suggests that in fraud cases, Courts have found defrauded customers take priority over the claims of general customers. (Id. at 10, citing SEC v. Megafund Corp., No. 3-05-CV-1328-L, 2007 WL 1099640 at *2 (N.D. Tex. Feb. 14, 2007.) The Commission further observes that it is within the Court's discretion to determine to "clawback" some of the $40,000 paid to SSA from the Collateral Reserve Trust Fund. Although the Commission does not recommend this approach, for the same reasons that it recommends not "clawing back" Customer withdrawals, it would not oppose a decision to retrieve funds from SSA should the Court deem it appropriate. (Id. at 12.)

### iv. Marvin Zobac (Dkt. No. 48.)

Mr. Zobac makes a general objection to the Distribution Plan, and contends that he invested $75,000 into what he thought was an IRA Reserve fund through Millennium Trust Company. Although he authorized the transfer of $37,000 from the Fund to another account, he claims to have never received any funds. He

objects to the Distribution Plan as he will receive no money from the current proposal.

The Commission responds that the alleged deficiencies in Millennium Trusts' administration is unrelated to the present litigation, and has no bearing on the distribution of assets that were obtained from Defendants' accounts. (Commission Response at 7.) The Defendants' documents suggest Mr. Zobac invested with Elsworth Berg through IRA custodian Millennium Trust Company, and that through Millennium Trust, he requested and received a withdrawal of the funds in the amount of $38,153.59. (Id.) Thus, the Commission asserts its belief that the figures utilized in drafting the proposal are accurate. (Id.)

### v. Ann Casey, Casey Family Trust Fund (Dkt. No. 51.)

Ann Casey filed an objection on behalf of the Casey Family Trust Fund ("Casey Trust"). She asserts that the removal of $61,277.31of funds by the Casey Trust should instead be treated as a closing of an account rather than a withdrawal counted against the pro-rata gross distribution. She contends that the funds withdrawn were a short-term deposit that was subject to being returned in full, and asks that the distribution for the Casey Trust be based on the balance of $38,722.69.

The Commission responds that the Trusts' funds were not shielded from risk as a "short-term deposit," and there is no reason to deem the Trust's receipt of funds as anything other than a standard withdrawal. (Commission Response at 6.) Accordingly, the Trust's recovery is properly discounted by its prior withdrawal of 61.3% (or $61,277.31 of the $100,000 contribution) of its' initial investment. (Id.)

### vi. Jerry Snoes and Sheila Pitts (Dkt. Nos. 60, 59.)

Mr. Snoes contends he was improperly labeled an Ineligible Customer and had his money invested in the Defendants products for at least two years, thereby entitling him to funds in the collateralized account. Ms. Pitts similarly objects to being ineligible to receive funds, and asserts she was never informed of a two year investment period.

Per the Revised Recommendations, the Commission notes that the collateral reserve coverage vests in these accounts after the expiration of two years. (Commission Response at 16-17.) Those customers who were not invested at a minimum of two years are considered ineligible customers. (Id.) Those customers who were not informed of the two year vesting period, such as Ms. Pitts, still would not receive funds even if considered eligible. (Id.) That is because according to the Defendants' records, Ms. Pitts and Mr. Snoes withdrew substantial funds from their accounts, more than what would have been their pro-rata distribution. (Id.)

### vii. Ronald White (Dkt. Nos. 63, 71.)

Mr. White contends that as one of the earliest contributors, his sole investment went towards the purchase of the relevant policy that Defendants used as part of the Collateral Reserve. He therefore asks that the Court treat his investment differently from other Customers. Mr. White also asserts that the $10,000 withdrawal of funds was a "gift," and makes general objections to the Rising Tide Method and instead advocates for the Net Loss Method.

In his Exparte Motion, Mr. White asks the Court to reconsider the Court's previous ruling denying his emergency motion. (See Dkt. No. 69.) Mr. White urges the Court to utilize the Rising Tide method of distribution, as he would not receive any funds under this proposed method, and advocates instead for the Net Loss Method. Mr. White details an unfortunate series of life circumstances which he asserts should be taken into consideration in determining the appropriate method of distribution. (Id.)

The Commission responds that the life insurance policy purchased for the Collateral Reserve came from money received from a variety of customers, and cannot be traced to any specific customer. (Commission Response at 12.) To support this contention, the Commission points to Ninth Circuit rulings that have found it inappropriate for a district court to use a "tracing" analysis to figure out which funds were used to purchase which policies. (Id., citing United States v. Real

- 9 -

11-cv-1651

Property Located at 13328 and 13324 State Highway 75 North, 89 F. 3d 551, 553-54 (9th Cir. 1966) [affirming district court's refusal to allow a "tracing fiction" when customer funds are pooled to purchase assets].) The Commission further asserts Mr. White's objections that his withdrawal should be a considered a "gift" are unsupported by any evidence. (Id. at 14.) The Defendants' records show Mr. White was distributed $10,000 as partial payment of his obligation, not as any other type of payment. (Id.)

**II. DISCUSSION**

The Court recognizes that it is unable to treat all the victims of the Elsworth Borg scheme absolutely equally as there are insufficient funds to repay each customer in full. As such, the role of the Court is to determine which distribution plan would be the fairest under the given circumstances.

"A district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." SEC v. Hardy, 803 F.2d 1034, 1037 (9th Cir. 1986). The "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." Id. at 134. District courts have "broad powers and wide discretion" to determine the appropriate distribution of funds to those who invested in a fraudulent investment enterprise. SEC v. Capital Consultants, LLC, 397 F.3d 733, 738 (9th Cir. 2005). Moreover, the Ninth Circuit has noted that equity demands equal treatment of victims who have been defrauded. See United States v. Real Property Located at 13328 and 13324 State Highway 75 North, 89 F.3d 551 , 553 (9th Cir. 1996) (Upholding the district court's approval of an SEC-administered plan to distribute the funds to defrauded customers on a pro-rata basis, and that "the equities demand that all [customers] share equally in the fund of pooled assets in accordance with the SEC plan.")

Upon review of the Customers objections and the Commission's responses,

the Court finds a pro rata distribution of funds according to the Rising Tide Method is the most appropriate available remedy under these circumstances. The Court observes that application of the Rising Tide Method will benefit some customers and not others. Approval of the Rising Tide Methods means that twenty eight customers will not receive any distributions from the estate because of their previous withdrawals. On the other hand, some of those customers received more than their pro-rata distribution because the proposal does not have a "clawback" provision. Additionally, over fifty customers will receive a pro rata distribution of the funds, regardless of whether their investment was large or small.

The Court finds the pro rata distribution methodology is the most appropriate in this situation. Under a pro rata distribution method, the "victims of the fraud [are] treated equally and [sic] the pro rata method would be protect all investors' interests." Commodity Futures Trading Comm'n v. Equity Fin. Grp., Inc., CIV.04-1512 RBK AMD, 2005 WL 2143975 (D.N.J. Sept. 2, 2005)(internal citation omitted). Moreover, the Court concludes the Rising Tide Method is the most equitable remedy available. Other courts have also come to the same conclusion. See, e.g. S.E.C. v. Parish, 2:07-CV-00919-DCN, 2010 WL 5394736 (D.S.C. Feb. 10, 2010); United States v. Cabe, 311 F.Supp.2d 501, 509 (D.S.C.2003) (favoring Rising Tide over Net Loss and holding that persons who have been previously repaid by the defendants should receive a reduced amount so that the total amount they receive both for the receivership distribution and from the earlier repayment from the defendants would roughly equal the amount they would have received from a pro rata distribution had they not received any money during the scheme from the defendants); Commodity Futures Trading Comm'n v. Hoffberg, 93 C 3106, 1993 WL 441984 (N.D. Ill. Oct. 28, 1993). As noted by the Court in Cabe in selecting the Rising Tide Method over the Net Loss Method, "[a] closer examination of [the Net Loss] proposal ... reveals that it suffers from serious flaws and produces inequitable results because it ignores the illegal activities of the

defendants," including the fact that the money paid to those investors during the course of the scheme "came from other victims of the fraud." Cabe, 311 F.Supp.2d at 509–510.

As reflected in these cases, the Rising Tide Method is the most equitable approach. In this case, all the eligible claimants contributed a certain amount of funds with the guarantee that they would receive their return. Some customers, under varying circumstances, withdrew portions of their investments prior to the initiation of this litigation, and will not receive any funds given those circumstances. The Court appreciates the time customers took to consider and file objections to the Commissioner's Distribution Plan, and understands that not every customer will be satisfied. The Court also understands the difficulties many of these customers face in this economic environment. Ultimately, the Court concludes consideration of prior withdrawals as a full or partial satisfaction results in a fair method for a majority of the defrauded customers. The Court further notes there is only a small portion of funds in the registry available for distribution, and it must consider the full amount of both contribution and withdrawal to ensure a fair distribution of funds. Overall, the customers' objections do not state sufficient reasons for not selecting the Rising Tide Method as proposed by the Commission. For these reasons, the Court believes that a pro rata distribution based on the Rising Tide Method results in the most equitable distribution of funds.

### III. CONCLUSION

For the above reasons, **IT IS HEREBY ORDERED**:

(1) The Distribution Plan, Dkt. No. 39, as amended by the Revised Recommendations, Dkt. No. 49, is hereby **APPROVED.**

(2) The Commission **SHALL FILE** within thirty days a proposed Final Distribution Plan according to the method approved herein and a proposed Order to Close the Interest Bearing Account and Disburse Funds according to the Final Distribution Plan. The proposed Order to Disburse Funds **SHALL INCLUDE** full

names, mailing addresses, tax identification numbers, and disbursement amounts for each eligible claimant. The Commission is **ORDERED** to **REDACT** for the public record each claimant's personal information.

(3) Customer Ron White's Exparte motion is **DENIED.** (Dkt. No. 71.)

**IT IS SO ORDERED.**

DATED: July 17, 2013

HON. GONZALO P. CURIEL
United States District Judge